915 A.2d 553 (2007)
390 N.J. Super. 289
Walter MARKIEWICZ, Petitioner-Appellant,
v.
STATE HEALTH BENEFITS COMMISSION, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted October 24, 2006.
Decided January 17, 2007.
*554 New Jersey Protection & Advocacy, Inc., for appellant (Susan W. Saidel, Camden, on the brief).
Stuart Rabner, Attorney General, for respondent (Michael J. Haas, Assistant Attorney General, of counsel; Jeff Ignatowitz, Deputy Attorney General, on the brief).
Before Judges KESTIN, WEISSBARD and PAYNE.
The opinion of the court was delivered by
PAYNE, J.A.D.
N.J.S.A. 52:14-17.29e, applicable to health insurance coverage offered by the respondent State Health Benefits Commission (SHBC), requires parity in coverage for treatments for biologically-based mental *555 illness and for other sickness. It provides in relevant part:
The State Health Benefits Commission shall ensure that every contract purchased by the commission on or after the effective date of this act that provides hospital or medical expense benefits shall provide coverage for biologically-based mental illness under the same terms and conditions as provided for any other sickness under the contract.
N.J.S.A. 52:14-17.29d defines "biologically-based mental illness" to be a "mental or nervous condition that is caused by a biological disorder of the brain and results in a clinically significant or [sic] psychological syndrome or pattern that substantially limits the functioning of the person with the illness, including, but not limited to . . . pervasive developmental disorder or autism."
Petitioner Walter Markiewicz, a public employee, is insured by the SHBC under its NJ Plus[1] plan. His son, T., is a covered person under that insurance plan. T. suffers from "pervasive developmental disorder, not otherwise specified," (PDDNOS or PDD), a severe condition, related to autism, that has caused gross delays in his development of motor skills and other neurological and muscular problems. The recognized treatments for his condition consist of occupational, speech and physical therapy.
The SHBC concedes that PDD is a biologically-based mental illness, that T. suffers from it, and that the therapeutic services provided to him are medically necessary. Nonetheless, after paying claims for such treatment for 22 months, commencing in June 2003 it has denied coverage for the treatment as the result of an exclusion in its health benefits contract as set forth in the NJ Plus Member Handbook for:
Educational or developmental services or supplies. This includes services or supplies that are rendered with the primary purpose being to provide the person with any of the following:
. . . .
 a service or supply that is being provided to promote development beyond any level of function previously demonstrated.
In this appeal from a final determination of the SHBC enforcing the contractual exclusion in the circumstances presented, petitioner challenges the enforceability of the exclusion, arguing that it is contrary to the Legislature's intent when including PDD within the scope of its mental health parity legislation, that the exclusion is ambiguous, and that the recognition of the exclusion in this case results in a denial of equal protection. Because we find that the contractual exclusion as applied to covered persons with PDD is contrary to the Legislature's intent in enacting the parity statute applicable to the State Health Benefits Plan, we reverse.

I.
T. was born on February 4, 1997 with PDD, a neurologically-based developmental condition of unknown origin that is presently incurable, although its symptoms are, to an extent, treatable. T's condition is manifested in significantly low muscle tone and weakness, with hypermobile joints that render T. unable to do activities such as holding a pen or throwing a ball, because he cannot maintain a grasp. Unaware of where his tongue is in his mouth, T. has problems swallowing, and he has been known to choke as a result. He has visual and auditory processing problems. *556 T. has severe problems with his balance, has little knowledge of where his body is in space, and must plan motions that, to others, would be automatic. Additionally, he is hypersensitive to touch, developing burn-like marks at pressure points as common as manufacturers' tags on clothes.
At a hearing conducted by an administrative law judge (ALJ) in the matter following the denial of benefits by the SHBC, Judy Richter, T.'s occupational therapist, testified without contradiction that physical and occupational therapy is the standard treatment for a child with PDD. T.'s treating pediatrician, Dr. Michael Schlitt, who also testified at the hearing, concurred.
Richter described the occupational therapy and its goals in the following terms:
Because of the nature of his disorder, there are many things that occupational therapy does that are unique to any other therapies. What I primarily focus on is his ability to process information from the environment and also from his body to help him become more aware of where his body is in space. He's sort of like a lost soul. Means of doing this are through use of suspension, which is swings. I use balls, wedges, heavy equipment, all to help him organize himself better. Because by giving input, heavy input to his body, he has a better sense of where he is and he can complete tasks with success.
. . . .
[T]he broad goal would be to help T. become as independent as possible. He's unable to function in the capacity that a child of his age should be. He's unable to do several tasks on his own without the implementation of O.T. But by asking him to put on his socks, an O.T. doesn't just look at that as, "Wow, you just put on your sock," what we look at is his ability to hold his body in flexion, to maintain both arms in front without having to keep [one] back here for support. We're looking at whether his eyes are capable of looking where his hands are, which is a huge problem with T.
So . . . my goal would be something like working on visual motor tasks and using that to produce a functional outcome.
In contrast, T.'s physical therapist works on his stamina, with a goal of getting him to sit and walk for longer periods of time, climb stairs without falling, exit a car, and perform other similar functions. It was stated that speech therapy is frequently utilized as a treatment for persons such as T. who have swallowing difficulties.
Richter testified that, if physical and occupational therapy services were not provided to T., he would regress, losing the skills that he had attained, a phenomenon that she had observed after an absence resulting from sickness or a vacation. Using tying shoes as an example, she testified:
It's so much work for his eyes to have to look and team together and look at the same place where his hands are. That it's such a struggle and such an effort to not hear the fan going and whatever else is going on in the room. To shut all that out and really concentrate on what he's doing and for his central nervous system to be able to hold that trunk up and keep those hands forward and lift that foot off the ground, it's so much effort for him. If we don't keep up with that stuff, he will regress. There's no doubt.
On cross-examination by the SHBC, however, Richter admitted that the occupational therapy that she had provided had increased T.'s development beyond what existed when he was first treated, although that development fell far short of the development *557 appropriate to his age level of almost eight years. Indeed, she admitted that the goal of the therapy was to "get beyond what . . . the child can currently perform" in order to increase the child's independence and to foster the development that in other children would happen naturally.
When pediatrician Dr. Schlitt was asked on cross-examination where T. would stand without the therapy that he had prescribed to treat the effects of his condition, he responded that T. would be "[m]uch worse." In response to the ALJ's question, the doctor testified that the therapy provided a definite benefit that was related to the level of treatment. However, the doctor, too, conceded that the effect of the therapy had been to permit T. to do things now that he could not have done before, although he was of the opinion that, with additional therapy, T. should be able to develop further skills. According to the doctor, his immediate goal was to promote the child's development "to the point where he's safe." Later, the doctor stated, he would be "fighting" to make T. a well-functioning person in society. "Just to make him safe isn't good enough, but he's not even safe yet."
The hearing also included testimony from David Perry, who was employed by Horizon, the benefits administrator for the SHBC's NJ Plus plan, as the Director of Account Management and Finance for the State Health Benefits Program. Perry testified that he believed that, prior to 2001, children with PDD were being provided with insurance coverage for occupational and physical therapy pursuant to the SHBC's presently existing contractual language. When Horizon's medical director determined from company data that the volume of therapy claims was "running at a certain level" and that therapy on behalf of children with PDD was being authorized, he contacted Perry to determine whether the SHBC wanted the developmental exclusion to be interpreted so as to bar such claims. It was then determined that such therapeutic claims had been "approved inappropriately." Thereafter, claims on behalf of children with PDD were flagged by Horizon to determine whether the claims fell within the developmental treatment exclusion. If so, they were denied.
Following the hearing, on July 7, 2005, the ALJ issued a written opinion in which he recommended that petitioner's claim for benefits be denied. The judge found, in relevant part, that occupational and physical therapy was being provided to train T. in "activities of daily living" in order to "promote development beyond any level of function previously demonstrated." The judge continued by finding:
That part of this therapy is aimed at developing the skills and abilities not yet demonstrated that will protect T. from harm does not lessen the fact that these are skills that he needs to develop, that some, if not all, of these involve "activities of daily living." The contract language does not differentiate between activities of daily living that have a safety element within them and those that do not, and the language does not differentiate between the promotion of development of functions not previously demonstrated that have safety elements and those that do not.
The judge additionally rejected arguments by petitioner similar to those offered on appeal that the contract was ambiguous, and that T., as a disabled child, had been denied equal protection of the law. The SHBC adopted the findings of fact and conclusions of law of the ALJ, along with his recommended disposition, and in a final decision dated August 16, 2005, denied petitioner's claim. *558

II.
The issue before us, in essence, is whether the Legislature intended, when it passed relevant parity statutes recognizing PDD as a "biologically-based mental illness," that the only effective treatments for PDD be barred from coverage by the SHBC under its NJ Plus plan as the result of a contractual exclusion contained in the Member Handbook provided to its subscribers. We find the Legislature's intent to have been otherwise.
The issue we confront is not a medical one, but rather, a matter of statutory interpretation. Heaton v. State Health Benefits Comm'n, 264 N.J.Super. 141, 147, 624 A.2d 69 (App.Div.1993). Because of its nature, we are not bound by the interpretation of the parity statute offered by the ALJ and accepted by the SHBC, although we may accord that interpretation considerable weight. Mayflower Sec. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973) ("An appellate tribunal is, however, in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue."); see also Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 69-70, 389 A.2d 465 (1978) (according deference to such agency interpretations). Nonetheless, in determining whether to intervene, we must restrict our inquiry to "(1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors." George Harms Const. Co., Inc. v. N.J. Tpk. Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994) (citing Campbell v. Dept. of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963) and In re Larsen, 17 N.J.Super. 564, 570, 86 A.2d 430 (App.Div.1952)).
We thus turn to the relevant legislation. In 1996, the federal government enacted a Federal Mental Health Parity Act, currently codified at 42 U.S.C.A. § 300gg-5. Following that enactment, in 1999, New Jersey enacted its own mental health parity act, applicable to persons covered by individual health insurance policies. See N.J.S.A. 17B:26-2.1s, which provides:
Every individual health insurance policy that provides hospital or medical expense benefits and is delivered, issued, executed or renewed in this State . . . shall provide coverage for biologically based mental illness under the same terms and conditions as provided for any other sickness under the contract. "Biologically-based mental illness" means a mental or nervous condition that is caused by a biological disorder of the brain and results in a clinically significant or psychological syndrome or pattern that substantially limits the functioning of the person with the illness, including but not limited to . . . pervasive developmental disorder or autism.
Later in that year, the substantially similar parity provisions that we quoted at the beginning of this opinion, applicable to insurance plans provided by the SHBC, were passed, effective January 18, 2000. See N.J.S.A. 52:14-17.29d and -17.29e. The primary legislative sponsors were identical for the two pieces of legislation, which were passed in the same legislative session within seven months of each other. The Senate and Assembly Statements accompanying the public employee version of the statute both note that the
bill would require that the State Health Benefits Commission provide the same coverage for biologically-based mental *559 illness to persons covered under the State Health Benefits Program as that required for other health insurers and health maintenance organizations under P.L. 1999, c. 106.[2]
[Statement to Assembly Bill No. 3588, December 12, 1999; Statement to Senate Bill No. 2277, December 13, 1999.]
Relevant evidence of the Legislature's intent in enacting the two parity statutes is not contained in their legislative histories. However, the State Department of Banking and Insurance, Division of Insurance, which administers the private insurer mental health parity law through promulgation of implementing regulations, has interpreted N.J.S.A. 17B:26-2.1s in a manner that is relevant to the present challenge. In May 2005, the Department adopted a proposed regulation, now codified at N.J.A.C. 11:4-57.1 to -57.4. Significantly, a portion of that regulation states that, "[n]otwithstanding the applicability of such exclusions to persons with physical illness, carriers shall not apply any exclusion in a health insurance policy or health maintenance organization contract to deny benefits for services or supplies that are medically necessary for the treatment of covered persons with biologically-based mental illness," and it specifically lists as inapplicable "[e]xclusions for physical, speech and occupational therapy that is non-restorative (that is, that does not restore previously possessed function, skill or ability)". N.J.A.C. 11:4-57.3(a)2. The rule also forbids "[e]xclusions for the treatment of developmental disorders or developmental delay." N.J.A.C. 11:4-57.3(a)4.[3]
The Department's intent in promulgating this regulation appears from its history. The regulation, in a different form, was originally proposed in 2003. Because of various shortcomings, the proposed regulation was amended and re-published for comment in its present form in 2004. One commenter mistakenly envisioned that other provisions of the regulation would permit a denial of benefits for vital occupational therapy services to children with global developmental delays, including children with autism and PDD, whose skill development is addressed by occupational, speech and physical therapists. The Department, interpreting N.J.S.A. 17B:26-2.1s and its proposed regulation, responded:
The Department believes that to allow carriers to exclude the primary mode of treatment for autism and pervasive developmental disorder (speech, occupational and physical therapy) would render the statutory directive meaningless and, therefore, cannot be permitted. Interpretations that render a statute void are to be avoided. The Department, therefore, interpreted the BBMI [biologically-based mental illness] mandate to require carriers to cover the primary treatments for these disorders and to preclude them from relying on exclusions to deny such coverage.
[37 N.J.R. 1523(a) (May 2, 2005).]
The Department's interpretation of the parity statute applicable to individual insurance plans is not binding on the SHBC or us. Nonetheless, its construction of a substantially identical statutory provision that it is authorized to interpret *560 is "`persuasive evidence of the Legislature's understanding of its enactment.'" St. Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 15, 878 A.2d 829 (2005) (quoting Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 212, 584 A.2d 784 (1991)).
We view the Department's regulations as reflecting a proper construction of the intent of the Legislature in passing the private insurance parity statute as it relates to the provision of benefits for developmentally disabled children who suffer from developmental conditions such as PDD and autism. As the Department has noted, an exclusion from coverage for claims based upon occupational, speech and physical therapy offered to developmentally disabled children would render meaningless the specific inclusion of PDD and autism within those biologically-based mental illnesses subject to the parity statute. The Legislature surely could not have intended that the principal treatments for developmental disabilities be excluded from coverage simply because those treatments differ in their essential nature from treatments applicable to other biologically-based mental illnesses, such as the use of psychiatric or psychological therapy and drugs. The fact that biologically-based mental illnesses affect development in some and other neurological functions in others should not be the determinant of coverage.
As we have noted, the parity statute applicable to coverage offered through the SHBC is, in all relevant respects, identical to that applicable to private, individual insurance policies. Statutes that share a common purpose should be harmonized, not read in conflict, F & W Associates v. County of Somerset, 276 N.J.Super. 519, 525-26, 648 A.2d 482 (App.Div.1994)a maxim that is particularly applicable when the statutes in question were passed in the same session, as these were. St. Peter's, supra, 185 N.J. at 15, 878 A.2d 829 (quoting In re Adoption of a Child by W.P. and M.P., 163 N.J. 158, 182-83, 748 A.2d 515 (2000) (Poritz, C.J., dissenting)).
The SHBC, espousing a literal reading of the parity statute, contends that its contractual exclusion from coverage of educational or developmental services[4] that promote development beyond any level of function previously demonstrated comports with the parity statute because it applies equally to the treatment of physical illness and biologically-based mental conditions. However, the SHBC's interpretation of the statute renders null the inclusion of PDD and autism within its parity provisions. A statute should not be read so literally that the purpose of the legislation is circumvented and an anomalous result is achieved, as has occurred here. Reisman v. Great Am. Rec., Inc., 266 N.J.Super. 87, 96, 628 A.2d 801 (App.Div.), certif. denied, 134 N.J. 560, 636 A.2d 519 (1993). In such a circumstance, literal interpretation must bow to a common-sense view of the law's intent. Wnuck v. N.J. DMV, 337 N.J.Super. 52, 57-58, 766 A.2d 312 (App.Div.2001). To read the governing statute as offering parity, but not affording coverage for medically necessary treatment of the very conditions that are the enumerated subjects of the parity provisions would be unreasonable.
The State Health Benefits Program Act, N.J.S.A. 52:14-17.25 to -17.45, created a state-funded, but privately-administered, health benefits program for public employees, established the SHBC, and authorized it to oversee the program. We have recognized that the "goal of the State Health Benefits Program Act is to provide comprehensive health benefits for *561 eligible public employees and their families at tolerable cost." Heaton, supra, 264 N.J.Super. at 151, 624 A.2d 69. Horizon's witness, Perry, testifying at the administrative hearing in this matter, stated that the SHBC's decision to enforce the developmental exclusion to preclude coverage for occupational, speech and physical therapy administered to children with PDD and autism, occurred after a rise in such claims had been recognized by Horizon's medical director. That interpretive decision, while conserving the public fisc, served to undermine the purposes of the parity statute as we read it. It is well established that an administrative agency may not exercise its delegated authority to alter the terms of a statute or frustrate the policy underlying an enactment. N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n., 82 N.J. 57, 82, 411 A.2d 168 (1980).
Unfortunately, PDD and autism, with the mental distress and treatment expenses that accompany them, are appearing with alarmingly greater frequency among children in this country. To public employees, coverage by the SHBC may provide their "only source of protection from [such] catastrophic medical expenses." Heaton, supra, 264 N.J.Super. at 150, 624 A.2d 69. Yet, the SHBC would interpret the parity statute in a manner that would permit the exclusion of benefits for medically necessary treatment of children with PDD and autism, thereby limiting state-employee coverage to a level below the statutory minimum imposed on commercial carriers. We do not perceive either the nature of the State Health Benefits Program nor the cost concerns of the SHBC as providing a ground for this distinction in coverage under governing parity statutes, particularly in light of legislative sponsor statements expressing the equivalence of coverage that was envisioned.
We offer no opinion whether the exclusion at issue can be implemented legitimately in contexts other than those presented. However, for the reasons we have expressed, we find its use to preclude coverage of medically necessary occupational, speech and physical therapy provided to children with biologically-based mental illnesses manifesting as developmental disabilities to be contrary to the mental health parity statute as set forth in N.J.S.A. 52:14-17.29d and -17.29e. An interpretation consistent with that of the Department of Banking and Insurance, as set forth in N.J.A.C. 11:4-57.1 through -57.4, is required.
In light of this resolution, we need not address petitioner's further arguments premised upon ambiguity and an equal protection violation.
Reversed and remanded to the State Health Benefits Commission for further action consistent with this opinion.
NOTES
[1] The name refers to the State's Point of Service plan.
[2] This is the underlying chapter law codified in part at N.J.S.A. 17B:26-2.1s.
[3] The SHBC has not promulgated regulations that specifically address treatments for PDD and autism. The administrative code simply contains a regulation adopting by reference "all of the policy provisions contained in the contracts between the health and dental plans and the State Health Benefits Commission as well as any subsequent amendments thereto". N.J.A.C. § 17:9-2.14.
[4] Neither term is defined by statute or regulation.