119 N.J. Super. 226 (1972)
290 A.2d 760
LILLIE SACHS, EXECUTOR OF THE ESTATE OF IRVING SACHS, PLAINTIFF,
v.
COMMERCIAL INSURANCE CO. OF NEWARK, NEW JERSEY, A NEW JERSEY CORPORATION, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 12, 1972.
*228 Mr. Frank S. Wexler for plaintiff (Messrs. Wexler and Guida, attorneys).
Mr. Floyd F. Lombardi for defendant (Messrs. DeSevo, Cerutti and Lombardi, attorneys).
LARNER, A.J.S.C.
Plaintiff brings this action as executrix of her late husband's estate, seeking reimbursement for certain medical expenses incurred during his last illness. The action is founded upon the contractual provision of a major medical expense policy issued by defendant to the decedent in connection with a group plan for members of the New Jersey Bar Association.
The first policy issued to Irving Sachs was dated November 1, 1964 and designated as GMC 4007. In 1966 the assured filed a claim under that policy for hospital and medical expenses incurred in connection with examinations, consultations and treatment commencing February 1966, necessitated by complaints of blackouts and general weakness of the upper extremities. Included in this treatment was a confinement to Pollak Hospital in Jersey City from February 14 to 24, 1966. The hospital report reflects a history of lightheadedness and syncope, with the first episode occurring in November 1964 and another similar episode in *229 November 1965. Subsequently, the episodes were more frequent without any particular timing or pattern of onset. The consultation report of Dr. Winokur, a neurosurgeon, diagnosed the condition in February 1966 as amyotrophic lateral sclerosis and arteriosclerotic brain disease with intermittent attacks of thrombosis of minor interracial vessels. Another neurologist, Dr. Valergakis, stated his opinion that the patient's attacks were due to "some disturbance in the heart," and he suggested an EKG. Such an EKG, however, demonstrated no abnormality. In addition to the foregoing diagnoses, the patient was a long standing diabetic suffering from diabetes mellitis which was under control at the time.
I find from an examination of the record of Pollak Hospital and the testimony of Dr. Medinets that prior to February 1966 the assured was suffering from cerebral arteriosclerosis and had active symptomology attributable to that disease, and that his diabetic condition was not causally related to his symptoms or his treatment at that time. I further find that the arteriosclerosis is progressive in nature and that the patient continued to deteriorate with more severe symptoms involving his brain and the functions of the brain as time went on.
It was because of this single syndrome that he required not only the hospitalization and treatment in 1966, but also the hospitalization in Fair Oaks from January 25, 1968 to March 28, 1968 and the subsequent hospitalization in Jewish Hospital from March 28, 1968 to the time of his death in March 1970.
The records are replete with evidence of a gradual deterioration of the patient's intellectual and mental powers, at least since 1964, with loss of memory and other symptoms characteristic of cerebral arteriosclerosis. I therefore reject as a fact plaintiff's contention that the cerebral arteriosclerosis was a new disease commencing in 1968.
The significance of this finding lies in the determination of the period of coverage for which defendant would be liable *230 under the aforesaid policy which limits payments to expenses incurred within two years from the date such expense first began. Defendant did pay for all covered expenses from February 1966 to February 1968 and contends that its obligation is at an end. In the absence of the problems raised by the issuance of a second policy in 1967, the position of defendant would be valid and sustained.
However, the issue is complicated by virtue of certain modifications of the insurance contract undertaken by the company in 1967. Sometime prior to November 1, 1967 the company, through its agent John A. Couch, Jr. & Co., notified all its assureds who were part of the Bar Association plan that because of poor experience it was modifying the terms of the policies with changes in coverages and benefits. On one hand this involved an increase in premiums and a larger deductible interest. On the plus side for assureds, the maximum benefit was increased from $10,000 to $12,500 and the benefit period extended from two to three years.
A letter from the agent was distributed to the assureds which explained the new benefits effective November 1, 1967 and referred to the new provisions as "modifications" and "liberalizations," with several indications that the existing plan was being modified. This represented a sales pitch to encourage the assureds to remain in the program.
It was pursuant to this new plan for the enrolled members of the Association that defendant, subsequent to the "Dear Policyholder" letter, issued a replacement policy No. GMR 1813, effective November 1, 1967, which contained, among other modifications, a provision that covered expenses would be paid for a maximum period during three consecutive policy years.
Plaintiff asserts that the 1967 policy is in reality an amendment of the original policy and that she is therefore entitled to coverage by way of payment for the medical expenses incurred beyond the termination date of the first policy to a point three years after the commencement of treatment of the illness or disease involved. Since I have *231 ruled that the expenses beyond 1967 are part and parcel of the treatment for the disease which commenced in February 1966, it would be plaintiff's contention that she is entitled to reimbursement for expenses until February 1969. And since payment was made to February 1968, she seeks recovery on this theory for expenses incurred for an additional year between 1968 and 1969.
Defendant counters that it performed its full obligation under the 1964 policy by payment of expenses incurred for two years, which period extended beyond the termination date of the earlier policy; and that a claim can only arise under the three-year plan of the new policy if it involves sickness or disease arising anew during the term of the new policy.
The issue, therefore, is whether the rights of the parties should be measured solely by the provisions of the new policy, without reference back to the existence of the old policy, or whether the two policies should be considered together as a continuous contract, with amendments benefiting the assured to be applied to an illness which predated the new policy.
It is fundamental that in the case of any ambiguity in a policy of insurance, the construction favoring the assured should be applied by the court. Ohio Cas. Ins. Co. v. Flanagin, 44 N.J. 504, 513-514 (1965); Sandler v. N.J. Realty Title Ins. Co., 36 N.J. 471, 479 (1962); Hunt v. Hospital Service Plan of N.J., 33 N.J. 98, 102-103 (1960); National Union Fire Ins. Co. of Pittsburg, Pennsylvania v. Falciani, 87 N.J. Super. 157, 167 (App. Div. 1965). As a corollary, a policy should be interpreted from the viewpoint of the reasonable expectations of the purchasing public Kievit v. Loyal Protective Life Ins Co., 34 N.J. 475, 482 (1961), and should be construed liberally in their favor "to the end that coverage is afforded `to the full extent that any fair interpretation will allow.'" Danek v. Hommer, 28 N.J. Super. 68, 76 (App. Div. 1953), aff'd 15 N.J. 573 (1954). See Schneider v. New Amsterdam Cas. Co., 22 N.J. *232 Super. 238, 242 (App. Div. 1952); Mahon v. American Cas. Co. of Reading, 65 N.J. Super. 148, 165 (App. Div. 1961); cf. Dittmar v. Continental Cas. Co., 29 N.J. 532, 542 (1959); Yannuzzi v. United States Casualty Co., 19 N.J. 201, 207 (1955). See also, Matits v. Nationwide Mutual Ins. Co., 33 N.J. 488, 495 (1960); Indemnity Ins. Co., etc. v. Metropolitan Cas. Ins. Co. of New York, 33 N.J. 507, 512 (1960).
The letter distributed by the agent is as binding upon the company as the formal policies themselves. The manner in which the new policy came into being, when taken together with the agent's representations, should result in a construction of the two policies and the letter as an integrated whole.
Fair dealing dictates that the decedent and all other assureds in the plan reasonably expected that their existing policies were continuing as heretofore, with the "modifications" and "liberalizations" representing amendments to the existing policies. The fact that the company utilized the form of a new instrument does not in itself detract from this construction, which accords with a layman's expectations from the nature of the transaction and the language utilized by the company and its agent. It would have required but a few clear words to inform the policyholders that the additional benefits under the new policy would not apply to the payment of claims which overlapped from one policy period to the other. Yet the letter is silent on that score.
The foregoing conclusion is further buttressed by the following undertaking contained in the letter from the agent:
7. Your replacement policy will include the standard Policy Provision regarding "Time Limit on Certain Defenses." However, the Company has further agreed that the portion of this Provision referring to "two years from the date of issue of this policy" shall mean "two years from the date of issue of the policy being replaced." All new policies will bear a stamp to the effect that the new policy is replacing a prior contract of insurance and will state the number of such policy.
*233 This latter provision represents an indication of the nexus between the two policies, so that contestability for a pre-existing disease or nonfraudulent misstatement was barred two years from the date of issuance of the first policy and not the second, despite the issuance of a new contract. Such a concession supports the construction that the assured could reasonably anticipate that his enrollment in the new plan by the payment of the additional premium would entitle him to the new benefits as to continuing treatment for a disease commencing during the term of the earlier policy. The additional benefits thus related back as an amendment to that earlier policy to apply to existing continuing claims, in the absence of a clear provision to the contrary.
This determination is particularly warranted because the policy was issued under a group plan which was attuned to the underlying motive of the company to continue the coverage for the group with the proposed changes. Each assured had the security of a noncancelable policy except for conditions which did not apply to the decedent herein. Consequently, the unilateral amendment of a policy which could not be cancelled by the company adds to the totality of factors which would lead the assureds to conclude that the coverage was a continuing one, rather than the initiation of a new relationship under a new contract.
One further issue remains for determination. Both policies contain a clause limiting the amount payable for mental disorders accompanied by hospitalization to a maximum of $2,000. The earlier policy uses the term "mental illness"; the later policy uses the terms "mental or nervous illness, disorder or emotional disturbance." Does either limitation apply to the disease of the decedent diagnosed as cerebral arteriosclerosis and amyotrophic lateral sclerosis?
I conclude that under the clause of either policy, the limitation was intended to apply only to purely mental disorders involving functional etiology, and not to mental symptomology produced by organic disease. In this case the affliction involved a physical deterioration and blockage of *234 the vessels in the brain because of sclerosis. The illness or disorder was thus the arteriosclerosis; the mental and intellectual deterioration was but the end result thereof. See Mutual Benefit Health & Accident Ass'n v. Rowell, 236 Ark. 771, 368 S.W.2d 272 (Sup. Ct. 1963), and 98 A.L.R.2d 277, 284.
It is reasonable to assume that the limitation was intended to delimit claims in cases of insanity or other degrees of mental aberration which are functional in origin. The public would not expect that such a limitation would control merely because the end result of an organic disease may affect the mental function of the individual. See Gareis v. Benefit Ass'n of Railway Emp. Ins. Co., 284 Minn. 262, 169 N.W.2d 730 (Sup. Ct. 1969); Prince v. United States Life Ins. Co., 42 Misc.2d 410, 248 N.Y.S.2d 336 (Sup. Ct. 1964), aff'd 23 A.D.2d 723, 257 N.Y.S.2d 891 (App. Div. 1965), aff'd 17 N.Y.2d 742, 270 N.Y.S.2d 209, 217 N.E.2d 33 (Ct. App. 1966). In any event, the policy language is sufficiently obscure to construe the same liberally in favor of the assured and against the company.
In view of the foregoing, judgment will be entered in favor of the plaintiff for all covered expenses incurred between February 1968 and February 1969. Counsel should be able to stipulate the amount involved and submit a consent order accordingly.