264 N.J. Super. 141 (1993)
624 A.2d 69
MARY-ELLEN HEATON, PETITIONER-APPELLANT,
v.
STATE HEALTH BENEFITS COMMISSION, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted October 6, 1992.
Decided April 27, 1993.
*144 Before Judges PRESSLER, R.S. COHEN and KESTIN.
Ferro Doyne LaBella & Logerfo, attorneys for appellant (Michael F. Logerfo on the brief).
Robert J. Del Tufo, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel, and Kathy Rohr, Deputy Attorney General, on the brief).
Greenberg Margolis, attorneys, submitted an amicus curiae brief for American Association of Retired Persons (Steve S. Zaleznick, Michael R. Schuster, Bruce Vignery, Patricia DeMichele, Robin Talbert, of counsel, and Howard Mankoff, on the brief).
The opinion of the court was delivered by COHEN, R.S., J.A.D.
Mary-Ellen Heaton was an employee of the Harrington Park Board of Education, and was therefore insured under the New Jersey State Health Benefits Program. Her husband Jack was a covered dependent. The statutory Program provides major medical benefits administered on behalf of the State by Prudential Insurance Company. The statute includes lifetime major medical expense benefits of $1 million for each covered person, but limits benefits for "eligible expenses incurred because of mental illness or functional nervous disorders"[1] to an annual $10,000 and a lifetime $20,000. N.J.S.A. 52:14-17.29(A)(2). The handbook distributed to employees, which we understand to embody the terms of the Program as communicated to the employees, describes the $10,000/$20,000 limits as applying to "mental, psychoneurotic and personality disorders." We do not read this phrase as an attempt *145 to alter or explain the statutory language. The regulations adopted by the State Health Benefits Commission do not deal with the matter at all. N.J.A.C. 17:9-1.1 to -7.4.
Jack Heaton was admitted to the Carrier Foundation on July 3, 1987, suffering from advanced Alzheimer's disease. He was discharged on August 25, 1987, to the psychiatric hospital (now known as Ramapo Ridge Psychiatric Hospital) at the Christian Health Care Center (CHCC). On September 22, 1989, some twenty-five months later, he was transferred to the nursing home portion of CHCC.
Prudential and the State Health Benefits Commission determined that the expenses incurred for Mr. Heaton's care at the CHCC psychiatric hospital were subject to the $10,000/$20,000 benefits limitation, and also that the treatment there was custodial, medically unnecessary, and therefore not eligible for reimbursement. Denial of the Heaton claim was then referred as a contested case for hearing in the Office of Administrative Law. After a plenary hearing, the administrative law judge determined that the treatment for Heaton's Alzheimer's disease was necessary and that it was not subject to the benefits limitation for mental disease. The Commission rejected that conclusion and affirmed its original determination. Its thesis was that although Heaton's mental disorder may have been the result of a medical condition, the treatment he received was for a mental disorder. It also decided that Heaton's stay at CHCC's psychiatric hospital was custodial and therefore unnecessary. We disagree on both counts, and therefore reverse.
The Program was first established and described in the New Jersey Health Benefits Program Act in 1961. L. 1961, c. 49; N.J.S.A. 52:14-17.25 to -33. It originally enrolled only state employees, but 1964 amendments extended benefits to employees of counties, municipalities, school districts, and other public agencies on an optional basis, that is, if the public entity chose to participate in the Program. L. 1964, c. 125, § 3-14; N.J.S.A. 52:14-17.34 to -45.
*146 The evidence before the administrative law judge on the question whether Alzheimer's is a mental disease permitted only one conclusion, that Alzheimer's is an organic mental disorder caused by a progressive degeneration of brain cells. It is a disturbance in behavior and thinking resulting from a known physical cause, as contrasted with schizophrenia and personality disorders, which are functional, i.e., they have no known physical cause. Alzheimer's is listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM III) as a physical disorder.
Alzheimer's cannot be cured. Patient care consists of dealing with behavioral or psychological symptoms, usually with drugs. Some patients need only custodial care. Others, like Jack Heaton, develop "behavioral disturbances to the point where for his own safety and management he required a psychiatric facility because this is the only place where a situation like this could be handled safely." However, according to the Heatons' expert witness, this did not mean Alzheimer's is primarily a psychiatric condition, but rather that the physical changes in the brain gave rise to psychiatric symptoms.
Heaton's symptoms in 1987 included agitation and resulting behavior problems so severe as to make him impossible to manage in a nursing home, and to require that he receive treatment with a major tranquilizer in the setting of a psychiatric hospital. Out of necessity, custodial care is also afforded in the psychiatric hospital, but the primary focus is on treatment and security. Only after such a patient becomes manageable, usually as the result of the progress of the disease itself, can he be put in a nursing facility for predominantly custodial care. For those reasons, the care provided at the psychiatric hospital was necessary, since it was the setting in which the required medication and physical management of the patient was available.
The Program's expert witness agreed that Alzheimer's is an organic physical disease, but emphasized that patients are treated psychiatrically, just like patients who suffer from nonorganic, *147 functional mental illnesses. To him, the kind of treatment administered required classification of Alzheimer's as a mental disease.
The Commission took the position that the statutory limits for mental, psychoneurotic and personality disorders were intended to limit coverage where the treatment at issue addressed behavioral problems, regardless of the cause. Thus, even if the etiology of a mental disorder is biological, resulting psychiatric treatment is subject to the psychiatric limit.
The issue of the application of the mental-disease benefit limitation is not a medical issue. It is a matter of statutory interpretation. There is no dispute that Alzheimer's is a physical condition, organic and not functional in nature, and that treatment of acutely agitated patients is appropriately undertaken by psychiatrists in psychiatric hospitals. The issue is whether application of the benefit limit to a patient's mental condition is to be determined according to its etiology, or according to the nature of the symptoms treated and the modalities of treatment.
The Commission's position would limit Program coverage for necessary psychiatric treatment not only of organic brain diseases but, if we understand it correctly, also for necessary psychiatric treatment necessitated by traumatic physical injuries to the brain or other parts of the body. Hospitalization for surgery for a traumatic brain injury or a brain tumor, for instance, would be fully covered, but psychiatric treatment of resulting personality and behavior changes would be covered only within the $10,000/$20,000 limit for mental illness.
If we were dealing with a commercial insurance policy, we would have no difficulty ruling that the mental illness benefit limitation does not apply to necessary psychiatric treatment for Alzheimer's disease. The language of limitation is, at the very least, ambiguous on the question whether cause or treatment of a condition engages the limitation. In those circumstances, the ambiguous language is construed against the profferer. A case directly on point is Sachs v. Commercial Ins. Co., 119 N.J. Super. *148 226, 290 A.2d 760 (Law Div. 1972), aff'd o.b., 124 N.J. Super. 258, 306 A.2d 83 (App.Div. 1973).
In Sachs, defendant insurer issued a group major medical expense policy for members of the New Jersey State Bar Association. Plaintiff's decedent suffered from cerebral arteriosclerosis, progressive in nature, causing a gradual deterioration of the patient's intellectual powers. Defendant declined to pay for over two years' resulting hospitalization. It relied on benefit limitations in defendant's two policies, in one for "mental illness" and, the other for "mental or nervous illness, disorder or emotional disturbance."
In Sachs, we held the limitations to apply "only to purely mental disorders involving functional etiology, and not to mental symptomology produced by organic disease." Id. 119 N.J. Super. at 233, 290 A.2d 760. "In this case," we ruled, "the affliction involved a physical deterioration and blockage of the vessels in the brain because of sclerosis. The illness or disorder was thus the arteriosclerosis; the mental and intellectual deterioration was but the end result thereof." Id. at 233-34, 290 A.2d 760.
The coverage provisions of the State Health Benefits Program Act, N.J.S.A. 52:14-17.29(A)(2) have been amended on five occasions since Sachs. L. 1975, c. 12 § 1; L. 1976, c. 41 § 1; L. 1981, c. 483 § 1; L. 1985, c. 428 § 1; L. 1989, c. 48 § 1. The argument could well be made that such frequent attention to the Program coverages would have eventually included a change in "mental disease" language if the Legislature disagreed with Sachs' construction of almost identical language contained in an insurance policy.
This court is not alone in ruling that benefit limitations like those for "expenses incurred because of mental illness or functional nervous disorders," N.J.S.A. 52:14-17.29(A)(2), focus on etiology as opposed to treatment.
The United States Court of Appeals, Seventh Circuit, had a similar problem in Phillips v. Lincoln Nat'l Life Ins. Co., 978 F.2d 302 (7th Cir.1992). There the insured patient suffered from *149 organic brain syndrome,[2] and its behavioral consequences. He was treated with medications in a hospital for the treatment and rehabilitation of persons with neurological disorders. The hospital did not provide general psychiatric care. The insurer sought to apply a $25,000 limitation on "charges for mental illness." The insurance policy had no definition of "mental illness." The insurer contended that the cause of an illness was irrelevant in determining whether an illness was physical or mental, and that a mental illness ought to be defined as a condition whose primary observable symptoms are behavioral. Plaintiff's view was that a condition flowing from an organic defect is not a mental illness, but rather a physical illness with behavioral manifestations. Moreover, no policy provision said that the symptoms of an illness, as opposed to its cause, determined whether it is a mental illness.
The Court of Appeals agreed with plaintiff. It held that without any definition or explanation of the term "mental illness," and without any language suggesting whether it was the cause or the manifestation that determined whether the limitation applied, the policy was ambiguous and thus had to be construed against the insurer.
Similar results have been reached in cases of autism, which has an organic cause, Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534 (9th Cir.), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990); organically caused manic-depressive disorder, Arkansas Blue Cross & Blue Shield, Inc. v. Doe, 22 Ark. App. 89, 733 S.W.2d 429 (1987); and organic brain defect causing behavioral abnormalities, Malerbi v. Cent. Res. Life Ins. Co., 225 Neb. 543, 407 N.W.2d 157 (1987). In Downey Community Hosp. v. Wilson, 977 F.2d 470 (9th Cir.1992), a limitation on medical benefits for treatment of mental illness was held to apply because the patients' hospital treatment was for a condition (not identified in the *150 opinion) determined to be without an organic cause, and it therefore did not qualify for coverage as treatment for a medical condition.
The majority view is not unanimous. In Brewer v. Lincoln Nat. Life Ins. Co., 921 F.2d 150 (8th Cir.1990), the patient was treated with drugs and psychotherapy for an affective mood disorder which the district court concluded was the result of organic causes as opposed to a reaction to life stresses. The Court of Appeals ruled that laypersons' understandings control the construction of policy language, and that laypersons do not classify illnesses according to origins but according to symptoms.[3] The court held that since the disease manifested itself in terms of mood swings and aberrant behavior, regardless of the cause of the disorder, it was "abundantly clear that [plaintiff] suffered from what laypersons would consider to be a `mental illness'." Id. at 154. Therefore, the "mental illness" benefits limitation was held to apply. Similarly, see Equitable Life Assur. Soc. v. Berry, 212 Cal. App.3d 832, 260 Cal. Rptr. 819 (6 Dist. 1989). Compare Simons v. Blue Cross and Blue Shield, 144 A.D.2d 28, 536 N.Y.S.2d 431 (1st Dept. 1989). In Simons, the treatment of malnutrition and hypertension, clearly physical conditions, were held free of a "psychiatric disorders" benefit limitation, even though the patient's underlying condition of anorexia nervosa was considered a psychiatric disorder. Simons is consistent with Brewer in focusing on manifestation instead of cause, but the Simons court promoted, and did not diminish, coverage.
The Program is not a commercial insurance policy. However, it is the only source of protection from catastrophic medical expenses for tens of thousands of public employees. A most difficult question presented by this case is whether Program provisions should be judicially treated like provisions of a commercial insurance policy, with all of the sound, traditional reasons for liberal *151 interpretations in favor of coverage, and against the insurer which chose the language. See Sparks v. St. Paul Ins. Co., 100 N.J. 325, 335-36, 495 A.2d 406 (1985); Hofing v. CNA Ins. Cos., 247 N.J. Super. 82, 89, 588 A.2d 864 (App.Div. 1991).
The Program language should not be approached exactly as one would approach the language of a commercial insurance policy. Since the "mental illness" benefit limitation is prescribed by statute, Program language following the statute should not automatically be construed against the profferer as a contract of adhesion. Instead, the limitation should be interpreted and applied in accordance with legislative intent and in furtherance of statutory goals. Saffore v. Atlantic Cas. Ins. Co., 21 N.J. 300, 310, 121 A.2d 543 (1956); Kennedy v. Allstate Ins. Co., 211 N.J. Super. 515, 519, 511 A.2d 1301 (Law Div.), aff'd o.b., 213 N.J. Super. 137, 516 A.2d 1117 (App.Div. 1986), certif. granted, 107 N.J. 71, 526 A.2d 153 certif. vacated, 107 N.J. 624, 527 A.2d 450 (1987); Tulipano v. United States Life Ins. Co., 57 N.J. Super. 269, 276, 154 A.2d 645 (App.Div. 1959). Cf. Ryan v. State Health Benefits Commission, 260 N.J. Super. 359, 616 A.2d 952 (App.Div. 1992).
The goal of the State Health Benefits Program Act is to provide comprehensive health benefits for eligible public employees and their families at tolerable cost. It establishes a plan for state funding and private administration of a health benefits program which will protect public employees from catastrophic health expenses, and which encourages public employees to rely on the Program instead of seeking protection in the commercial insurance market.
By undertaking that very consequential role in the financial security of public employees and their families, the State also undertakes to play fair with them. Hidden or unfair reservations in insurance policies are ignored because they do not reflect the reasonable expectations of the parties. Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992); Sparks v. St. Paul Ins. Co., 100 N.J. 325, 336, 495 A.2d 406 (1985). Because of the significance of health insurance to public employees and *152 their families, and the Legislature's undertaking to furnish insurance and determine its scope, one of the goals of the Legislature must have been to assure the fair and even-handed application of Program provisions, and the avoidance of crabbed interpretations of ambiguous terms.
The reasonable expectations of both the State and the insured public employees are reached in large part after a consideration of the scope of the protections offered by the commercial insurance market. If Program provisions compatible with the statute appear to furnish protection consistent with the offerings of the commercial insurance market, those provisions should be interpreted in a consistent manner. Thus, judicial interpretations of coverage provisions of commercial insurance contracts should guide, if not control, interpretation of Program provisions.
A word about the Commission's role in the interpretation of statutorily prescribed Program provisions. The Commission is created by N.J.S.A. 52:14-17.27 to "establish a health benefits program for the employees of the State * * * [and to] establish rules and regulations as may be deemed reasonable and necessary for the administration of this act." The Commission is empowered by N.J.S.A. 52:14-17.28 to negotiate for and buy health insurance contracts providing at least the statutory levels of coverage.[4]
The statutory provision governing coverages contains a number of references to the Commission. The principal one relates to major medical expense benefits, and is found in N.J.S.A. 52:14-17.29(A)(2):
The commission may, by regulation, determine what types of services and supplies shall be included as "eligible medical services" under the major medical expense benefits coverage as well as those which shall be excluded from or limited under such coverage.
The Commission has adopted regulations, N.J.A.C. 17:9-1.1 to -7.4, but they may be searched in vain for any substantive reference *153 to what is included, excluded or limited under the major medical expense benefit coverage. Both the statute and the regulations may also be searched in vain for any reference to authority conferred on the Commission to adjudicate disputes arising out of denials by Prudential of major medical expense claims. The authority may be contained in the Commission's contract with Prudential, which is not part of the record. However, that contract is not a regulation and was not adopted according to the Administrative Procedure Act. N.J.S.A. 52:14-4.
We will not attempt to find the elusive source of the Commission's adjudicatory role, unmentioned in statutory or regulatory provision. We are not hostile to the notion of necessarily implied administrative powers, but we note that the remedy of a traditional lawsuit is a ready alternative to administrative relief. It is a remedy expressly mentioned in the employee Handbook written and distributed by the Commission. The point is that the Commission has not exercised its authority to regulate on the subject of coverages for mental illness; the Commission's adjudicatory authority, if it exists at all, might be supplied only in a contract with an insurance company. In those circumstances, it is hard to justify deferring to the Commission's view of the meaning of "mental disease" as it is used in N.J.S.A. 52:14-17.29(A)(2). See also Mayflower Securities Co., Inc. v. Bureau of Securities, 64 N.J. 85, 93, 312 A.2d 497 (1973) (an appellate court is not bound by an agency's interpretation of a statute).
We note the possible implications of the absence of any apparent statutory or regulatory underpinning for the Commission's adjudicatory authority over coverage disputes, and we urgently invite the attention of the Commission and the Attorney General to the matter.
Reversed.
NOTES
[1] The statutory phrase has changed over time. The changes are not material and do not illumine the meaning of the phrase.
[2] The patient suffered from congenital encephalapthy, a brain malfunction manifested by neurological defects whose exact location in the brain cannot be pinpointed. The neurological defect gave rise to a cluster of behavioral disorders. Phillips, supra, 978 F.2d at 304.
[3] It is hard to say how the court came to that conclusion, except perhaps by intuition.
[4] Since 1989, the Commission is barred by statute from cutting benefits from 1988 levels, except as may be modified by a State collective bargaining agreement. N.J.S.A. 52:14-17.28a.