**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0486-22

PRINCETON NEUROLOGICAL
SURGERY, P.C.,

    Plaintiff-Appellant,

v.

HORIZON BLUE CROSS BLUE
SHIELD OF NEW JERSEY,

    Defendant-Respondent.

_____

> Submitted January 8, 2024 – Decided January 17, 2024
>
> Before Judges Mawla and Marczyk.
>
> On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0796-19.
>
> Buttaci Leardi & Werner, LLC, attorneys for appellant (John W. Leardi and Nicole Patricia Allocca, on the briefs).
>
> Stradley Ronon Stevens & Young, LLP, attorneys for respondent (Adam J. Petitt, of counsel; Robert J. Norcia, on the brief).

PER CURIAM

Plaintiff Princeton Neurological Surgery, P.C. (PNS) appeals from: an August 16, 2019 order dismissing its claims against defendant Horizon Blue Cross Blue Shield (Horizon) for lack of subject matter jurisdiction and failure to state a claim; a November 15, 2019 order denying PNS's motion to amend its complaint; and six September 2, 2022 orders granting Horizon's motion for summary judgment and other relief dismissing PNS's common law claims. We affirm.

PNS is a neurological surgery practice that is an out-of-network provider with Horizon and has no contractual fee agreement when it treats Horizon's beneficiaries in exchange for participating in Horizon's managed care network. Between 2014 and 2017, PNS made insurance verification calls to Horizon before treating Horizon-insured patients: D.A., K.C., J.C., D.C., M.G., D.K., T.M., P.M., B.M., and D.R.[1]

According to PNS's complaint, during each call, PNS disclosed the procedure it intended to perform and each patient's insurance information to Horizon. PNS "verified the amount of benefits payable for each service by requesting . . . the reimbursement methodology for out-of-network services, the applicable patient cost sharing under each plan, including deductibles, co-

_____

[1] We use initials pursuant to Rule 1:38-3(a)(2).

A-0486-22

payments, and/or co-insurance, and also the annual out-of-pocket maximum . . . under each patient's [p]lan."  Horizon verified PNS was eligible for payment "based on a specific percentile of the [FAIR] Health[2] guidelines" as an out-of-network provider.

PNS's complaint noted it understood the "verification of [p]lan benefits" was "not . . . a guaranty of payment."  Indeed, during every verification call placed to Horizon, there was a recorded disclaimer the representations made during the call were not a guaranty of payment.  A PNS employee confirmed this fact during her deposition.  Furthermore, PNS's complaint acknowledged it knew "there are items outside of eligibility that affect reimbursement [such as] medical necessity."  PNS performed the surgeries on the Horizon-insured patients after the verification calls.

FAIR Health is used to calculate benchmark healthcare charges based on an aggregate dataset of actual charges for medical treatment and procedures, organized by geographic location, and arranged from lowest to highest costs,

---

[2]  "FAIR Health is an independent nonprofit that collects data for and manages the nation's largest database of privately billed health insurance claims and is entrusted with Medicare Parts A, B and D claims data for 2013 to the present." FAIR Health, https://www.fairhealth.org/about-us (last visited Jan. 9, 2024).

A-0486-22

broken into percentiles.[3]  It provides a fee estimator, which allows providers to view the benchmark charge data "in distinct geographic areas, called geozips, which are generally identified by the first three digits of a zip code."[4]  Another methodology for calculating benchmark charges is the Prevailing Healthcare Charges System (PHCS) database.

After performing the surgeries, PNS billed Horizon.  The bills for each patient and Horizon's payments were detailed in PNS's complaint as follows:

> A. [PNS] submitted a bill to Horizon on behalf of D.A. detailing CPT[5] codes valued at $157,512.00.  The [ninety percent] Fair Health value for those services for geozip 085 is $102,494.22.  Horizon only paid $45,251.00, therefore leaving a balance of $57,561.22.
>
> B. [PNS] submitted a bill on behalf of K.C. detailing CPT codes valued at $351,384.00. The [ninety percent] Fair Health value for those services for geozip 085 is $219,317.93. Horizon only paid $116,935.75, therefore leaving a balance of $67,099.50.

---

[3]    FAIR Health, Benchmarks That Mirror the Market, https://www.fairhealth.org/methodologies (last visited Jan. 9, 2024).

[4]  FAIR Health, Frequently Asked Questions, https://www.feeestimator.org/faq (last visited Jan. 9, 2024).

[5]  The American Medical Association (AMA) promulgates CPT codes for every procedure reimbursable by medical insurance providers.  See *CPT Codes, Then and Now*, American Medical Association (Aug. 4, 2015), https://www.ama-assn.org/practice-management/cpt/cpt-codes-then-and-now.

A-0486-22

C. [PNS] submitted a bill on behalf of J.C. detailing CPT codes valued at $115,161.00. The [ninety percent] Fair Health value for those services for geozip 085 is $79,238.19. Horizon only paid $4,948.87, therefore leaving a balance of $16,736.10.

D. [PNS] submitted a bill on behalf of D.C. detailing CPT codes valued at $151,749.00. The [ninety percent] Fair Health value for those services for geozip 085 is $104,931.11. Payment should be [twenty percent] of the billed charges according to the [ninety percent] Fair Health value, which totals $30,349.80. Horizon only paid $7,871.95, therefore leaving a balance of $22,477.85.

E. [PNS] submitted a bill on behalf of M.G. detailing $220,978.00 worth of services. The [ninety percent] Fair Health value for those services for geozip 085 is $145,106.97. Horizon only paid $68,208.00, therefore leaving a balance of $96,537.00.

F. [PNS] submitted a bill on behalf of D.K. detailing CPT codes valued at $221,805.00. The [seventy percent] Fair Health value for those services for geozip 085 totaled $100,669.00. Horizon only paid $74,931.20, therefore leaving a balance of $25,737.80.

G. [PNS] submitted a bill on behalf of T.M. detailing CPT codes valued at $82,093.00. The [ninety percent] Fair Health value for those services for geozip 085 is $48,587.70. Horizon only paid $23,198.00, therefore leaving a balance of $25,389.70.

H. [PNS] submitted a bill on behalf of P.M. detailing CPT codes valued at $151,749.00. The [ninety percent] Fair Health value for those services for geozip 085 is $112,176.28. Horizon only paid $62,083.00, therefore leaving a balance of $50,093.28.

I. [PNS] submitted a bill on behalf of B.M. detailing CPT codes valued at $257,145.00. The [ninety percent] Fair Health value for those services for geozip 085 totaled $119,290.59. Horizon only paid $6,714.94, therefore leaving a balance of $13,157.54.

J. [PNS] submitted a bill on behalf of D.R. detailing CPT codes valued at $168,001.00. The [ninety percent] Fair Health value for those services for geozip 085 with the appropriate [twenty percent] balance is $76,790.40. Horizon only paid $37,413.75, therefore leaving a balance of $39,376.65.

In total, PNS claimed Horizon underpaid $414,166.14, despite that during the verification calls Horizon represented it would pay: ninety percent of Fair Health value for D.A., K.C., J.C., D.C., M.G., T.M., P.M., B.M., and D.R.; and seventy percent of Fair Health value for D.K.

Eight of the patients were covered under the State Health Benefits Plan (SHBP), which is governed by the State Health Benefits Commission. The SHBP Member Handbook qualifies what it will pay by repeatedly stating it "covers only reasonable and customary allowances . . . determined by the FAIR Health benchmark charge data or a similar nationally recognized database." The SHBP patients were K.C., J.C., D.C., M.G., T.M., P.M., B.M., and D.R. D.K. and D.A. were covered under Horizon plans governed by the Employee Retirement Income Security Act (ERISA).

6

At summary judgment, Horizon cited the SHBP and noted that aside from using the FAIR Health or PHCS databases to calculate the payment to an out-of-network provider, reimbursement was subject to "terms, conditions, and limitations of the health benefits plan and Horizon's administration of the same." Horizon noted the ERISA-governed health benefits plans gave Horizon "considerable discretion" to decide what was covered and what to pay PNS for treating D.K. or D.A. Horizon's discretion included the ability to decide whether a service was "'incidental' to another service or contrary to the 'framework of generally accepted methods of medical management currently used in the United States.'"

FAIR Health releases updated data every May and November. Horizon updates its system with the May data in July and the November data in January.

On November 18, 2016, the Horizon customer service representative told PNS that D.K.'s out-of-network benefits would be reimbursed at the FAIR Health seventieth percentile. PNS never asked, and Horizon never specified, whether it would use the May 2016 or November 2016 FAIR Health data to calculate reimbursement. Furthermore, as noted in the parties' joint statement of undisputed facts, PNS had not seen D.K. for an initial consultation when it made the insurance verification call with Horizon. On January 4, 2017, D.K.

7

had her surgery and PNS submitted its claim to Horizon two days later. Horizon paid PNS at the seventieth percentile of the FAIR Health database, using the May 2016 FAIR Health data because the November 2016 data was not made effective in Horizon's system until January 29, 2017.[6] PNS disputed Horizon's use of the November 2016 FAIR Health data. However, a PNS employee testified at deposition that Horizon never told PNS it was going to use the most recent FAIR Health data, and PNS never told Horizon it expected reimbursement would be based on the latest FAIR Health data.

On February 13, 2015, PNS made the insurance verification call to Horizon regarding D.A. Like D.K., PNS does not dispute it did not know what services it would provide or how much it would charge Horizon, because D.A.'s initial consultation had not yet occurred. Horizon told PNS D.A.'s out-of-network benefits would be reimbursed at the ninetieth percentile of the FAIR Health data. Following the call, PNS saw D.A. and then sought prior authorization from Horizon for the services PNS deemed necessary, which Horizon granted on February 27, 2015.

---

[6] Horizon further reduced the sum it paid because one procedure submitted by PNS was considered incidental to another procedure. PNS does not dispute the secondary deduction.

D.A.'s plan defined an allowed charge as the "standard approved by [Horizon's] Board." As a result, Horizon reimbursed PNS at the eightieth percentile of the PHCS profile. The parties do not dispute this did not match what the Horizon representative told PNS during the insurance verification call. Also, PNS submitted a claim form noting D.A.'s procedure took place in Plainsboro, but the billing address was noted as Hamilton. FAIR Health uses the geozip for the location of the procedure. However, Horizon applied the geozip for the billing address. PNS claimed it expected Horizon to reimburse according to the procedure geozip.

In 2019, PNS sued Horizon alleging five common law causes of action, including, as relevant here, promissory estoppel and negligent misrepresentation. Horizon moved to dismiss the complaint as pertained to the eight SHBP patients on grounds the Law Division lacked subject matter jurisdiction because the Commission had final authority over payment of benefits and resolutions of disputes. The court entered the August 16, 2019 order, directing PNS to present its claims to the Commission and granting Horizon's motion.

PNS moved for leave to file an amended complaint, alleging it had no standing to bring claims before the Commission because it was not a legal

representative of the SHBP patients. The court entered the November 15, 2019 order denying PNS's motion, and held the SHBP patients were indispensable parties to PNS's common law claims and therefore a motion to amend would be futile. PNS's subsequent motion for reconsideration was denied.

In 2021, PNS moved for summary judgment on the remaining claims relating to D.A. and D.K. Horizon cross-moved for summary judgment, arguing PNS's claims were preempted by ERISA. The court entered the September 2, 2022 orders, denying PNS's motion and granting Horizon's cross-motion dismissing each count of the complaint. The court issued a separate opinion, finding PNS's claims were "expressly preempted by Section 514 [of ERISA] because they impermissibly 'relate to' and make 'reference to' D.K.'s and D.A.'s ERISA-governed health benefits plans."

I.

On appeal, PNS argues the August 16, 2019 order finding the court lacked subject matter jurisdiction was based on an erroneous interpretation of Beaver v. Magellan Health Services, Inc., 433 N.J. Super. 430 (App. Div. 2013). Likewise, the November 15, 2019 order denying PNS's motion to amend the complaint because it lacked standing before the Commission was erroneous.

A-0486-22

PNS asserts the court's reliance on Beaver was misplaced because there the plaintiff had standing as a beneficiary to raise claims before the Commission, but then sued in the Law Division as a collateral challenge to a final agency decision "cloak[ed] . . . under the mantle of contract and tort." Id. at 441. The plaintiff in Beaver had already unsuccessfully appealed the agency decision and conceded the new case was brought to recover "unpaid benefits." Ibid. PNS argues, therefore, that Beaver is distinguishable.

PNS asserts the court clearly had jurisdiction because a provider cannot appeal a claim to the Commission. It notes the assignment of benefits signed by patients does not cure the standing issue either. Further, its reimbursement claims did not require a determination by the Commission because the dispute with Horizon regarded the reimbursement methodology, which the court was capable of adjudicating.

"Whether subject matter jurisdiction exists presents a purely legal issue . . . ." Santiago v. N.Y. & N.J. Port Auth., 429 N.J. Super. 150, 156 (App. Div. 2012) (internal citations omitted). Therefore, our review is de novo. Ibid.

There is no dispute PNS lacked standing before the Commission because it was not a member of the health plans administered by the Commission. N.J.A.C. 17:9-1.3 allows any "member" to pursue complaints internally with the

plan, and if the matter is unresolved, the member "may request that the matter be considered by the Commission." A member is defined as any covered individual, whether a "subscriber or a dependent." N.J.A.C. 17:9-1.8. The Horizon Member Guidebook reiterates "[o]nly the member or the member's legal representative may appeal, in writing, to the [Commission]."

The Commission was created by the New Jersey Health Benefits Program Act, which "establishes a plan for state funding and private administration of a health benefits program . . . ." Heaton v. State Health Benefits Comm'n, 264 N.J. Super. 141, 151 (App. Div. 1993); see N.J.S.A. 52:14-17.24 to -45. "The [SHBP] is, in effect, the State of New Jersey acting as a self-insurer." Burley v. Prudential Ins. Co. of Am., 251 N.J. Super. 493, 495 (App. Div. 1991).

"[T]he [Commission] alone has the authority and responsibility to make payments on claims and to limit or exclude benefits." Beaver, 433 N.J. Super. at 433 (citing N.J.S.A. 52:14-17.29(B)). The Act empowers the Commission to create "rules and regulations as may be deemed reasonable and necessary for [its] administration . . . ." N.J.S.A. 52:14-17.27(a). Pursuant to this authority the Commission adopted N.J.A.C. 17:9-1.3, which permits only members, not providers, to pursue appeals with the Commission.

Therefore, the trial court's jurisdictional ruling was correct. The central issue was the reimbursement methodology used to pay PNS. This necessitated an interpretation of the SHBP, which can only be performed by the Commission. The Commission alone has the authority to adjudicate disputes related to the SHBP, N.J.S.A. 52:14-17.27, and through N.J.A.C. 17:9-1.3, created a regulatory scheme whereby only members have standing to pursue reimbursement claims. As a result, the court also properly denied PNS's motion to amend the complaint because it would not resolve PNS's lack of standing.

II.

PNS argues its claims regarding D.K.'s and D.A.'s ERISA-governed plans were not preempted because the Third Circuit has held state common law claims are not claims for benefits due under an ERISA plan in Plastic Surgery Center, P.A. v. Aetna Life Insurance, 967 F.3d 218, 229 (3d Cir. 2020)). PNS likens its case to Plastic Surgery and argues its promissory estoppel claim arose when Horizon made representations to PNS regarding payment, which the court could adjudicate without interpreting the ERISA plans.

In Plastic Surgery, the Third Circuit ruled that a promissory estoppel claim by an out-of-network provider for payment under an Aetna health plan was not preempted by ERISA. Id. at 230. The court held the preemption of a common

law claim by ERISA depends on whether it seeks to "enforce obligations independent of the plans" or if a determination of liability requires construction of the terms of the plans. Ibid.

PNS asserts the trial court applied too stringent of a standard because, in effect, its ruling was that any reference to ERISA triggers preemption. PNS argues its claims were not tethered to the plan, because the dispute regarded its request for payment under "an appropriate percentile of FAIR Health" and its reliance on Horizon's representations of what it would pay for D.K.'s and D.A.'s treatment. In other words, like Plastic Surgery, preemption played no role because: the dispute was not one that ERISA intended to govern; its claims did not interfere with the administration of the ERISA plan; and preemption would undermine ERISA's purpose by permitting insurers to induce out-of-network providers to provide services with knowledge ERISA's preemption would bar payment to the providers.

"A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. of Manalapan, 140 N.J. 366, 378 (1995). "Whether a state law claim is preempted by ERISA is a question of law which is reviewed de novo." Feit v. Horizon Blue Cross & Blue Shield of N.J., 385

14

N.J. Super. 470, 482 (App. Div. 2006) (quoting <u>Finderne Mgmt. Co. v. Barrett</u>, 355 N.J. Super. 170, 185 (App. Div. 2002)).

We are unpersuaded by PNS's arguments. Section 514(a) of ERISA preempts state law claims that "relate to" an ERISA plan. 29 U.S.C. § 1144(a). As the trial court noted, the scope of State laws preempted by this provision is expansive, encompassing "all laws, decisions, rules, regulations, or other State action having the effect of law, of any state[.]" <u>Menkes v. Prudential Ins. Co. of Am.</u>, 762 F.3d 285, 294 (3d Cir. 2014). A State law "relates to" an ERISA plan if it has either a "reference to" or a "connection with" that plan. <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 97 (1983).

<u>Plastic Surgery</u> is inapposite. There, the out-of-network provider was not entitled to reimbursement and entered a separate agreement with the insurer, to cover a specific procedure for the patient "along with related medical services" and pay "a reasonable amount for those services according to the terms of the [ERISA p]lan." 967 F.3d at 224, 232. The insurer "agreed to approve and pay for" the surgery at the "highest in[-]network level." <u>Id.</u> at 224 (alteration in original). The Third Circuit held:

> Whether the [provider] seeks to enforce obligations independent of the plan turns on whether the parties agreed (i) that [the insurer] would provide payment for all services necessary to perform the

respective surgeries, leaving only the amount of payment pegged to the terms of the plan; or (ii) that the scope of coverage, as well as payment, would be limited to the terms of the plans—leaving open the possibility that some services would not be compensated at all.

[Id. at 231 (internal citation omitted).]

Here, the record reveals no express or implied agreement, let alone a promise that cross-referenced D.A. and D.K.'s ERISA plans as the parties had in Plastic Surgery. Moreover, reimbursement remained contingent upon the services D.A. and D.K.'s plans deemed necessary or incidental. In D.K.'s case, there was no representation Horizon would apply the November 2016 FAIR Health values, and Horizon was not mandated by law to apply the updated FAIR Health figures. In D.A.'s case, Horizon was not required to reimburse using the address where PNS rendered services. Although Horizon's application of the PHCS methodology for reimbursement in D.A.'s case contradicted what its representative told PNS during the insurance verification call, the call was preceded by a disclaimer and the prior authorization did not pertain to the payment or result in a payment agreement.

III.

PNS challenges the summary judgment ruling dismissing its promissory estoppel and negligent misrepresentation claims. It contends Horizon made a

16

promise, which induced PNS to render services to the patients. Further, the court erred by finding there was no reliance because the disclaimer abjured a guaranty of payment, which had nothing to do with Horizon's duty to provide accurate information to out-of-network providers like PNS.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court considers "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540 (1995). "[W]hen the evidence 'is so one-sided that one party must prevail as a matter of law,' . . . the trial court should not hesitate to grant summary judgment." Ibid. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). "[W]e review [a] trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016).

Promissory estoppel requires: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." Goldfarb v. Solimine, 245 N.J. 326, 339-40 (2021) (quoting Toll v. Bd. of Chosen Freeholders, 194 N.J. 223, 253 (2008)). A party asserting a negligent misrepresentation claim must show the defendant had a duty of care. Zielinski v. Pro. Appraisal Assocs., 326 N.J. Super. 219, 224 (App. Div. 1999). Whether a duty exists is a matter of law determined by the court after "balancing several factors" including "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc., 135 N.J. 182, 194 (1994) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).

The trial court correctly concluded PNS's promissory estoppel claim failed because as we noted in section II, Horizon did not promise PNS anything. The lack of a promise was confirmed by Horizon's disclaimer. Moreover, PNS could not have reasonably relied on Horizon's representations as it had not seen the patients, let alone rendered services to them at the time of the authorization call with Horizon.

18

The negligent misrepresentation claim could not survive summary judgment because Horizon's duty was to its insured beneficiaries, not PNS. Horizon had no contract with PNS. We recognize <u>Plastic Surgery</u> found the opposite, but there the insurer and the out-of-network provider had a contract. Therefore, the court found leaving out-of-network providers with no means of enforcing their contract

> would in effect allow insurers to illegitimately supplement their provider network by making promises of payment to induce the provision of services, safe in the knowledge that those out of network would have no recourse for breach of those promises. The consequence . . . would be for providers to begin to require up-front payments from patients or to "deny care or raise fees to protect themselves against the risk of noncoverage."
>
> [<u>Plastic Surgery</u>, 967 F.3d at 239 (quoting <u>Lordmann Enters. v. Equicor, Inc.</u>, 32 F.3d 1529, 1533 (11th Cir. 1994).]

Setting aside that PNS and Horizon did not have a contract, we are not convinced the concerns raised in <u>Plastic Surgery</u> exist here. We are not persuaded it would serve the public interest to bind Horizon based upon an authorization call that was subject to a disclaimer. To find a duty under these circumstances would harm insureds, because Horizon would be hesitant to field calls from out-of-network providers, who in turn would decline to provide

19 <span>A-0486-22</span>

services to the insureds because they could not obtain authorization from the insurer.

Finally, Horizon did not misrepresent a fact that PNS justifiably relied upon. Even in the case of mistaken representation regarding the reimbursement methodology in D.A.'s case, there was no reasonable reliance because PNS did not know D.A.'s diagnosis or the CPT codes it intended to bill. Therefore, the payment PNS would receive was not yet known.

For these reasons, summary judgment in Horizon's favor was properly granted. To the extent we have not addressed an argument raised on appeal, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0486-22